Keetoowah Band of Cherokee Indians in Oklahoma, individually and on behalf of all other Native Americans Indian Tribes and Tribal Organizations, NRDC, and Intervener Edward Myers, Lassie, Frank, and Elle. These names were the targets of the Cherokee Indians. Good morning, Your Honors. May it please the Court. My name is Stephen V.S. Gavin, and I'm representing the Petitioner Tribes and supporting Interveners. I've asked if that's okay to reserve three minutes for rebuttal. Before I begin, let me just give you a brief introduction to how we're going to argue this case. I will be addressing the NHPA issues. Ms. Buccino will address the NEPA issues, and Ms. Landreth will address what is at stake for the tribes and our collective national heritage. Thank you. The FCC has adopted an order that poses a grave threat to the tribes' ability to protect irreplaceable elements of tribal culture, sacred sites, and ceremonies that are essential to tribes' cultural survival. In doing so, the FCC has acted contrary to the plain language of the National Historic Preservation Act and eviscerated its intent. Tribal historical properties are part of our collective national heritage. My argument today will focus on three issues. Number one, geographic area licensing is a federal undertaking based on the plain language of NHPA. Number two, the FCC has eliminated the way it complied with NHPA for small cells by excluding pre-construction review for such small cells. And number three, regarding macro towers, the FCC may not approve industry applications without tribal input. For these reasons, the court should vacate and remand to the commission for proceedings consistent with the NHPA. Geographic area licensing is a federal undertaking based on the plain language of NHPA. This order is contrary to law. Section 106 of the NHPA provides that a federal agency having direct or indirect jurisdiction over a proposed federal undertaking shall take into account the effect of the undertaking on any historic property. The NHPA expressly states, and is acknowledged by this court in CTIA, an undertaking includes a federal license. The key word in this is license, a term in the NHPA that the FCC ignores in the second report in order. Mr. Gavin, has the FCC ever treated a geographic area license as a federal undertaking? Your Honor, the FCC has in this, the way that mobile systems are now authorized is pursuant to these wider area licenses. As we outlined in our initial brief, initially they were site-specific, but now they are being granted on larger geographic areas, and indeed, in some instances, as large as the entire United States. But it doesn't change the obligation that there is an NHPA. The question is a little bit more focused, which is, has the FCC treated geographic area license or any kind of spectrum license as a federal undertaking? And I thought your answer was going to be, sure, look at CTIA. Well, that's right. That's where I'm going, Your Honor, is that, for example, a television station license where you build and operate a tower, that's an undertaking. The key term, as I was trying to explain, Your Honor, is the license. The mobile telephone system, including new small cell facilities, is part of a comprehensive licensing scheme. In the past, though, there were requirements both of licensing of the spectrum and of licensing of construction. And the Commission is taking the position that now that there's no requirement of licensing of construction, that that was the hook for... You mean the two-phase licensing construction that just changed under Section 319 was amended. But, Your Honor, for example, even the NPA in 2004, the Nationwide Programmatic Agreement, came after the Commission had begun doing this kind of licensing. The fact is that in some instances, even today, these mobile carriers have to have licensing obligations that arise, filing modification applications, filing notifications to the FCC. The federal license to use the spectrum, itself a federally regulated public resource, and federal build-out requirements that go along with the license. This is the essence of this. I just want to understand how what you're saying relates to the statute, particularly 309D, which says a permit for construction shall not be required for stations licensed as common carriers, right? That's what the statute says. The default position that Congress has set up is for common carriers who have licenses, they don't need permits for construction, right? They don't need a construction permit prior to receiving their license. That's correct. Well, it just says, period. Okay, so now where does the Historic and Environmental Review fit into that? Explain that to me. So, if they don't need a permit, what does the FCC... The FCC grants them a license, Your Honor. Right. The FCC grants them... And they don't need a permit to construct this. They need a license to operate a cellular system. Right. So, a party could even contract with a... A licensee could even contract with a third party to construct. So, it's the licensing decision that triggers the NHP and environmental... It is our position, Your Honor, that that's precisely it. Okay, but suppose they grant the license before they know where any of the towers are going to be. Come on. Your Honor, part of how this system works is that a license, initially, as you point out, is granted without any tariff. As I was explaining to Judge Pilar, in some instances, it's not just a whole region of the United States, it's conceivably the entire United States. The entire country, right. So, how does that work? Just explain this to me. Well, for example, we included in our brief an example of the case of a wireless license for Verizon that was granted in Auction 73. Section 27.14H of the rules outlines the ongoing obligations of a licensee and even notes that a licensee is subject to enforcement authority, including the FCC's ability to cancel the license. Indeed, the FCC retains the right to modify a license under Section 316 of the Communications Act. Right, but where does the Historic Review and the Environmental Review fit in? That's all I'm asking. This is a fact question. Tell me. It fits in, Your Honor. If they grant a license to a company in an auction, okay, and the company's going to go then if it gets its billed on cell towers, right? That's correct, Your Honor. Where does the Historic Review and the Environmental Review fit in? Because the license... They don't need a permit, so... Because, Your Honor, the NHPA, which was written in such a manner that it says that the undertaking shall take into account that a license is an undertaking, as this Court has... I'm just asking how it's done. That's all. How does it... When they grant the license, how do they take into account the historic... Well, the current procedure, Your Honor, is that there... Well, the procedure's up until the adoption of the second report in order. There was the tower construction notification system that licensees themselves or their subcontractors would be... would file a notification with the SEC. There would be the opportunity for tribes to... In our case, the tribes to consult on what were areas that might be disturbed that were important to our cultural heritage. You're talking about construction. Excuse me, Your Honor. You're talking about construction. Correct. That's not what Judge Stata asked. So, is it your position... I'm trying to understand the same thing. Is it your position that under the current system, it may not be sort of very functional, the way that Historic Preservation Review is happening, but that what is being licensed is not just the spectrum, but the deployment of the spectrum, and that over its history, the Commission has worked through what the appropriate sequences are of authorizing the use of the spectrum and reviewing the deployment of the spectrum in a way that makes sense in terms of timing, and that it's really their obligation to continue to do that because this is a licensed activity?  When the FCC amended its rules in 1990 to require NHPA review prior to tower construction, the Advisory Council, which is the entity that has been... the agency that has been charged by Congress to interpret the NHPA, welcomed the change, saying it would help resolve major problems. This process continued through the development of the National Programmatic Agreement Rulemaking 2004, and in entering into the NPA with the Council, the FCC acknowledged the FCC's tribal obligations under NHPA. Indeed, in the report in order adopting the NPA, the Commission indicated, and this report at page 116 of the CTIA opinion noted, that they saw no grounds for departing from the Council's interpretation of a statute that the charge was implementing. And the Council has said... Let me try to ask, I think, the question the three of us are asking in a different way, okay? So under 309-D, a license... There was no requirement for permits. You mean 319-D? I mean 319-D, yeah, thank you. Under 319-D, there's no requirement for common carrier getting a license permit. Then the Commission issues its Interim Approval Authority Regulation, right? And they do that in order to fulfill what they believe is their obligations under these two statutes, right? They say, we're going to require permits. We're going to have limited approval authority in order to fulfill our responsibility for these two reviews, environmental and historic, correct? Correct. Okay. Now the Commission has... And we sustain that. Now the Commission has said, well, wait a minute, these new 5G antennas are tiny. They're not going to have much of an impact. And given our obligation to promote the spread of advanced wireless technology, we think it's best to exclude them from the limited approval authority. So they're basically back under 319-D now with respect to 5G antennas, right? Your Honor, they're all... It isn't the question before us whether that decision is arbitrary and capricious. Your Honor, we believe that the decision before you is more... Is the obligation that the Commission has to consider and to defer to the Advisory Council on questions involving NHPA. And if I just could give you a visual, Your Honor, that we're talking about tens of thousands of 50-foot antenna towers, the equivalent of a five-story building. And poles being drilled into the remains of ancestors and other culturally and religiously sensitive sites. We're not talking about small, small constructions and tens of thousands of them. I have a question about that just practically. When we think about the core 5G deployment, we think about it in a city where there are already utility poles, buildings, and co-locations going on. Where there are few people and the area is rural, are there plans for small cell farms or... I mean, what is the situation that is realistic where 5G would be being brought where a lot of new small tower facilities would be put? Well, Your Honor, first of all, the effect of the Commission's regulation is we won't know where they're going to be put. So, because that's what the effect of the second report in order is. I have the same question. What do we imagine? Assuming you have someone living all by themselves, you know, on a distant farm, okay? Are they right that what's going to... That person can get 4G now because they're living within, I don't know, a couple of miles of a tower somewhere, right? But for 5G to work for that farmhouse, they're going to have to install one of these pizza boxes like on the street outside the house, right? I think that's correct. That's the way it works. Or a whole series of them coming up the highway. Right. Or a whole series of them coming up the highway or some other kind of means of haunting by microwave to another station and then, I'm assuming, and then to the tower that is located by this farmhouse in the middle of nowhere. Right. Okay. So, but still what we're talking about is, and particularly in areas that are more developed, is clusters of these antennas, five-story building antennas in order to provide this coverage. As I've seen, I'm exceeding my time. If I can just quickly make one remark and then I hope that I can preserve my time. But we need a vocateur and direction to conduct a proper rulemaking pursuant to the NHPA. The remit should remind the FCC that the agency directed by the statute with responsibility for NHPA has said that the council, the advisor council, has said that the projects requiring the license are undertakings under the NHPA. I just have one more question. You make a challenge to the promulgation of the rule also in violation of the NHPA. And is that challenge limited to that the NHPA's consultation requirements were not done? You weren't asking for a wholesale historic preservation analysis of the rule. You were asking for consultation. For consultation of the NHPA, which NHPA specifically, the NHPA, the entity, which only two weeks ago, Your Honors, you said that it would be entitled, is the agency entitled deference on these questions? My question is just about is it just an upfront consultation or are you envisioning that there should have been some kind of upfront historic preservation analysis, a kind of wholesale analysis of the impacts on the land? The effect of the directive of rulemaking is to eliminate those on the individual sites, Your Honor. Our principal contention is that the commission ignored the advisor council's position on this question that the small cell wireless facilities are covered by the NHPA. And, indeed, the commission is here only four years after saying in 2014 that they were covered, now saying that they're not. Right. And so you're saying that your challenge to the order as such, the promulgation order, is not limited to the failure to consult. It's also limited to the failure at that level when it was wholesale removing this whole category of review, what impact that is going to have on postal sites. That's correct, Your Honor. Okay. Thank you. Thank you, Your Honor. I'll give you a couple minutes. Thank you. We'll come back up. Good morning, Your Honors. I have asked to reserve two minutes of my time for rebuttal. I will focus my time on the NHPA-specific issue, which is whether the order itself is a major federal action requiring NHPA analysis. And the answer is yes. There are a couple reasons for that. The FCC uses these orders, like the one challenged here, to conduct its rulemaking. The plain language of the Council on Environmental Quality's NHPA regulations, and that's 40 CFR 1508.18, include rules in the definition of major federal action. This Court's precedent has included rules within the definition of major federal action. Is it Puccino? Yes, exactly. Is your claim that there wasn't NHPA review of the order as such, that is bound up with or is the same as the claim that the FCC should have gone through the Council on Environmental Quality's procedure for making a categorical exclusion? Because that is a form of NHPA review, and that would have been the way to do this. Because I see that claim in your comments, and you cite to that claim as preserving your self-challenge to the order. But there's a little bit of a different articulation in the briefing, which is challenging the promulgation of the order, in the comments, which is challenging the failure to use the categorical exclusion procedure. But in your mind, are those the same things? Yes, they are. And the FCC had a choice to comply with NHPA when it issued the order. It could have done an environmental impact statement. It could have done an environmental assessment, or it could have gone through the procedures that the ECQ has set out to do a categorical exclusion. They did not do any of those. What would that have looked like? What would that have looked like? Let's assume you're right about that. Would it have, initially when you were as part of it, would it have assessed the long-term environmental impact of the exclusion of small cells? Is that what it would have done? So there are a couple things that would have gone into that review. And it would have looked like actually what they did in the 2014 rulemaking. And there, there was a critical statement, which was they assessed both the individual and the cumulative impact of the types of activities. So they would have had to go through that assessment. They would have had to look at the record, some of which was in the record here, in terms of the potential harm that all of these activities would cause. But didn't the commission do that? Its order is full of analysis of the record saying that, you know, we looked at the comments, and there's only a tiny fraction of these small cell sites that cause problems. I mean, it did review everything in the record about that. And it concluded that the public benefit outweighed the minuscule environmental impact that these would have. I would argue otherwise. They looked at a small part of the record. And if you look at the joint appendix, and this is part of their order at paragraph 68, and it's in the joint appendix at 828 and 29, they're citing to industry comments, print comments about the costs. What they did not look at the record, and a number of these are in our briefs, there are many more sites to the record. And let me just give you one, and this is a joint appendix 159. This is a letter from Columbia University. It's Dr. Martin Blank. He states, quote, there is now sufficient scientific data about the biological effects of EMS, and particular about radiofrequency radiation to argue for adoption of precautionary measures. But, Ms. Pacino, on the EMS, there are guidelines on permissible EMS. You may challenge them as inadequate, but there are guidelines. And so part of what's constraining the deployment of small cells is they're deemed not to have an environmental impact in EMS terms if they are followed in those guidelines. Why isn't that just as positive of any cognizable NEPA-discovered environmental harm in terms of the EMS? Well, they do have guidelines. We do take issue with them as being inadequate. That's a separate proceeding. Correct. But the problem is that what they have gotten rid of is the mechanism of review to evaluate whether those they have no mechanism anymore to ensure compliance with those guidelines. I understand that, and that's why I was asking you about your challenge to the whole order, and in particular to the failure to go through the Council on Environmental Quality's process for establishing a category of inclusion, because they can look at this and say, yes, the FCC is right, industry is right, we don't now see any problem, but there is a process had they gone through that mechanism for promulgating the category of inclusion. And there is a process for monitoring and looking every few years. Maybe the science has changed. Maybe there are things happening that we didn't anticipate where there is a farm of small cells that's actually running roughshod over some environmental resource. That's correct, but I think it's also important that the court not stop there and not only rule on the issue of the failure of the order to comply with NEPA. And it's really just like this court's very recent decision in the James River case, the National Parks Conservation Association case, where the court addressed the key underlying legal issue. And that here is, as we were discussing at the end with my colleague, whether that FCC license triggered application of NEPA and the NHPA. And if I could just respond to the question. I have a question about what you just said about the James River case. So in that case, the impact was on the river and the historical sites. Is the impact here flow from the electromagnetic radiation or does it flow from the presence of these devices around the country? In other words, what's the environmental impact that you think they should have assessed? It's both. It's both. It is the health. That's within the scope of NEPA. But it's also the impact that it has on people's property values, the impact that it has on schools that their children go to, and people's values having a say in those decisions. And that has been taken away from them unlawfully. So is your point then that this order is arbitrary and capricious because it didn't sufficiently consider that? Or is it your position that they have an obligation to do an EA first to decide whether an environmental impact statement was necessary? So our position actually is that this order is not in accordance with the law under APA, and it's because it violates the plain language of both the definition of major federal action and the definition of undertaking under the NHPA. Okay. And this goes to the question at the end that you were asking. Yes, the Communications Act, Section 319D, is the source of one responsibility that the FCC has. But they have other responsibilities that they have ignored in this case. And they have separate independent responsibilities. I want to ask you, you didn't answer his question. He's asking you, is this a process objection you're making, or are you saying they have no legal authority, no matter what they do with process, they have no legal authority to do this? Where are you coming from? It is a process violation, but it is more than that. No, you've got to do better. We try very hard. You're going to help us? You've got to do better than that. He asked you a very straightforward question. Are you claiming they are without legal authority to do what they did, or are you claiming that what they did was not done properly? I'm claiming both. And it doesn't have to be a process objection because NHPA is a process statute. Now you've really lost me. Okay, all about process. Yes, okay. Process, process, process. Yes. So it is a process objection. But the process is integral both to how they issue the order and the process that they now have gotten rid of in the substance of that order. Okay, so you're saying that there are two points of federal action that need that are relevant to the environmental law. One is the promulgation of this order, the whole new program, the new approach at the wholesale level. And you're also saying that without a properly promulgated policy like this, CEG through the Council on Environmental Quality's categorical exclusion process, without that they have obligations that attach to the issues of geographic area licenses. And so there's sort of two points of federal action to which NHPA obligations attach unless they've done something to respond to that. Correct. And there is, though, a wholesale way to respond, which would be to seek a categorical exclusion, right? That is correct. That would obviate the need in every, the citing of every, I mean, if it were successful, in every individual placing of these dorm fridges or pizza boxes or whatever they are to do some kind of EA. That is correct. That is correct. But they do need to look at the record and what was missing, which if you look back at their 2014 order, they very clearly, they went through the steps they were supposed to do a categorical exclusion. And it included a determination of both the individual impact but also the cumulative impact. And that is something they have completely ignored here. And if they didn't do, I mean, in a way, the categorical exclusion is more appropriate to this action because if you had a system in which they were saying, oh, yeah, let's just do an EA on every deployment, you would be looking at each one in isolation, would you not? And that seems bizarre. Right. And that is, in essence, our argument as to both NIFA and the NHPA is that both statutes provide quite a bit of flexibility in how these reviews are done. And the parties, the tribes have been working for years to make a sensible review. But now, instead of continuing to work collaboratively, which is something Commissioner Clyburn pointed to in her defense of this order, they have chosen to simply, the order completely gets rid of review at all and they have washed their hands of their separate responsibilities under NIFA and the NHPA separate from that section in 319D, which is what the FCC chooses to rely on solely. And so they have blinders on. Yes, they have the right not to choose to do a review at the time of construction. But when they issued those geographic licenses, they deferred both, they deferred site-specific analysis, both for environmental consequences and historic consequences. They couldn't do it very easily at that point, I'll admit. But the choice to defer it means that they can't now decide not to do it, which is what they've decided. When you refer to collaboration, are you talking about the development of a national programmatic agreement? That's one example. And in the context of NIFA, they could have done a programmatic. They could have done a programmatic EA. It doesn't necessarily have to be an EIS. They could work with a community. And the companies, AT&T, Sprint, Verizon, they're coming into a community. They know where they want to site these things. Work with the SEC to do the environmental analysis on the scale of the community. Involve the community. What's your response to the notion that the SEC will get up and say, we've never recognized any NIFA obligation attending the licensing of the spectrum? It's only ever related to construction, and that's, there's no construction licensing here. 319D, done. My response to that is that 319 and this limited approval authority is the only source of, it's not the only trigger for NIFA. It does flow back to the license. Now, they might argue that we should have challenged the license. The limited approval authority itself does flow from the licensing, from the spectrum licensing, doesn't it? Well, it does, but by eliminating the limited approval authority, they have not eliminated the license that they issued. And what we are arguing is that now, where these facilities are being- See, I think their answer, the commission's answer, well, we can get them up here and ask them, but I think their answer is going to be, yes, the license is for spectrum, and there isn't a sufficient federal involvement in the construction of the tower to trigger environmental review. It's separate. It's a local function. That's their argument. But their problem is that they didn't do the review before when they issued the license, and they made that choice, and it was, look, it was difficult to do before because they didn't know where these things were going to be cited. But even if that, even if there was no 319D, the issuance of the license itself is both an undertaking and a major federal action. But is the issuance of the- I mean, the only environmental effect of the issuance of the license itself would be then the environmental effect of the spectrum of the radio wave that it licenses. How can it carry with it the environmental effect of the construction, of the deployment through physical infrastructure of the radio wave? So that gets to a critical piece of the nature of this license. And in the license, they are obligated to build out and to do this construction. So it is not reasonable to separate what is, to separate the construction from the license, even though it's happening later. And there are a couple of provisions in the law that support that. I will point you to 47 U.S.C. 27.14. That's titled Construction Requirements, and I quote from it. Failure by any licensee to meet this requirement will result in forfeiture of the license. So they are trying to hang their hat on 319D to say that we don't need to worry about the construction at all. But our argument is that that can... The mere fact that a federal license, this occurs in lots of agencies, the mere fact that a federal license contemplates local activity doesn't mean that the local activity now becomes a major federal undertaking. I mean, it just doesn't follow. Right, and I would agree with you on that. And that's why these licenses and the fact here are different than other circumstances. And it is because of these statutory provisions that incorporate into the license this construction that follows. No, they incorporate the understanding that there will be construction. And if it's not done, you can lose the license. But that's different from taking control of the construction and making construction a federal activity. I mean, there are so many examples, I think, in the federal realm where that goes on. We don't take control of all of the following local activities merely because the federal activity contemplates some. Well, I hear what you're saying. And I guess the way I would distinguish the circumstance here is I'm not aware of anything similar like we have here, which is the spectrum is a unique public resource. And the license is for the use of the spectrum. And the build-out requirements and the construction is necessary for that use. How do you distinguish it from Big Ben or Big Ben decision? The Big Ben decision? Yeah. Isn't it pretty similar? Yes. So I think it is distinguishable. Well, why? Because that case involved, if I'm remembering correctly, that was the case with FERC, the Federal Energy Regulatory Commission, and it involved FERC's oversight of an export facility, which they clearly had jurisdiction of. The question was, should they also, in their NEPA analysis, also include impacts of the pipeline, which was an intrastate. It was wholly within Texas. And so FERC does not have jurisdiction over that at all. But did they have an obligation to look at those consequences? It's different here because there is jurisdiction. And this goes to the nature of the license and that the license is for the use of the spectrum, which the FCC cannot avoid the fact that they have jurisdiction over the use of the spectrum, which includes facilities that are necessary to use it. And it was their choice not to fulfill the obligation to do site-specific analysis of site-specific impacts when they issued that license. At the time those licenses were issued, they did have a process for doing site-specific analysis later. And now they have gotten rid of it, and that is what is unlawful. Okay. Thank you. Thank you. Thank you. May it please the Court, my name is Natalie Landris, and I represent the Blackfeet Plaintiffs, the Blackfeet Tribe, Kushana Tribes, Fort Belknap Indian Community, Rosebud Sioux, Ute Mountain Ute, and United Southern and Eastern Tribes. Up until about 250 years ago, 100% of this country was Indian land. There are countless ancient sites, some older than the pyramids in Egypt, as well as more modern sites all across this country, and all irreplaceable once lost, and all part of our collective national heritage. Now the Court asked a question about creating a picture for what that might look like. And so let me tell you what that will look like in Indian country. If you go to the Joint Appendix, page 28, Blackfeet Tribes themselves wrote an email, and they explained that one of these sites, which the FCC describes disingenuously, I might add, as being the size of a pizza box, that would have displaced an ancient burial site, because 20% of these require new construction. And that's already admitted by the defendants. And in fact, isn't almost the entire category that we're concerned with here, those that require new construction, because those that are co-located are already under prior rules, generally exempt from... That's exactly correct. And these are exactly why, in 1992, when Congress amended the NHPA, they amended it specifically to include tribes, specifically to include tribal heritage sites. And in this case, the FCC purports to exclude itself from those obligations that created a process specifically to safeguard our ancient national heritage, just to save a few hundred dollars for billion-dollar private companies. But it has no authority to do so. Now, I want to answer as well one of the questions the court brought up about what is supposed to happen here. What is this process? Is consultation the only failure? But the amazing thing is solving this process was so simple. It was so obvious because the FCC has been doing it for 15 years. They are well aware of the procedures under 36 CFR 800.14. There are five or six different ways for them to manage this issue. Five or six different ways. Yes. But, Ms. Landis, they have argued that in the period of their experience, in the previous way that they were complying with the NHPA, they had escalating costs to the point where a third of the costs of a deployment were wrapped up in this NHPA process. And so their concern is that it's bad and getting worse. Well, two answers to that, really. One is that the average site cost stuck specifically with the tribe is in the defendant's own brief. It's $532. So the FCC is engaged in a cost-benefit analysis deciding this site is not worth $532. The exponential increase in cost, they have no evidence, no study. What they do is cite a single environmental consultant report who aggregates all of the costs together, but then they separately say in their brief, well, it's really only $532. So that's what you're looking at. But the more important part is not factual. It's that the NHPA itself does not have a cost-benefit analysis in it. It does not have a policy analysis. The NHPA says if it's an undertaking, these processes apply. And the ACHP in this case, in two specific places over two years, said very clearly we're the agency charged with interpreting the statute, and we're telling you it's an undertaking. And when they proceeded with the second reporting order anyway, they said we still think you're wrong. And that, I believe, is at page 256 of the record going on to 257. And I see I've expired my time. Thank you. We'll hear from the commission. May it please the Court. Jacob Lewis with the FCC for the government. Your Honors, the basic issue in this case is whether the NHPA and NEPA apply in the first instance. The commission for many years had retained a limited approval authority arising out of Section 319D, requiring pre-construction review of wireless facilities deployments. But in the order under review, the commission took a fresh look at the application of that limited approval authority to the deployment of a limited class of small wireless facilities and determined that, looking at the record, that the costs of that review were wildly out of proportion to any of the record evidence about the benefits of such review. So under the Communications Act, it determined that it would not apply or no longer apply the limited approval authority to those deployments of small cell facilities. Now, that meant that the only basis that this Court upheld in CTIA for small facilities, the application of NHPA and NEPA, had been removed. So it then became a question, an argument was made, that nonetheless, because of spectrum licensing, not construction licensing, but spectrum licensing, that the deployment of small cells was a NHPA undertaking and a NEPA major federal action. The commission reasonably determined that the connection between the spectrum licensing, that is, in this case, geographic area service licensing, and construction was insufficient to render that subsequent construction, which is the subject and result of private decisions under state and local oversight. It was insufficient to render that a commission or federal undertaking or a major federal action. The decision whether to deploy small cells is a private decision. The commission no longer is involved in that process. And as Judge Tatel pointed out, the statute itself, years ago, removed the requirement for construction licensing for facilities for wireless carriers, unless the commission affirmatively determined to be in public interest. With the removal, the commission's decision to remove its limited approval authority, any remaining basis for application of the NHPA and NEPA disappear. And Judge Pillard, to your question about categorical exclusions or programmatic agreements, those are only applicable if the statutes apply. Otherwise, there is no need to be involved in negotiating a programmatic agreement or determining a categorical exclusion. Right. I understand that. Isn't it the case, though, that in the past, I mean, it's actually difficult to read the history, and it would be really helpful to have your perspective, but it appears that in the past, the issue that's presented here about whether the spectrum and the construction are really, somehow, really separate activities, the one license, the other not, that that's really been, it hasn't been clear. And, in fact, there have been plenty of times when the commission understood that, well, the licensing of the spectrum and the occurrence of the construction license or not happened at different times, and we have to figure out a way to have the sequence make sense, the approval, but also the environmental and historic preservation reviews. And when you read the 1990 Amendment of the Environmental Rules, that's in a situation where construction licenses were not required. Right? Yes, Your Honor. And yet, the commission says again and again, you know, we have to ensure that we fully meet our obligations under the federal environmental law. You know, our responsibility in the environmental law is to consider potential harm to the environment before it occurs, and it says federal environmental law requires the commission, as a licensing authority, to consider independently the effects of its actions on the environment. So I think it's very- Irrespective of limitations on state and local. So it appears that what the commission has always recognized is that the construction that occurs is deployment of the valuable spectrum, and therefore, that one way or another, there's some need to sequence and work out a practical and efficient way to do the requisite reviews. That's one way to read the 1990 order, and I'd be interested in your thoughts on how to read it. So two points. One is I do think the commission has always distinguished between construction permits. I think the Communications Act distinguishes that between construction permits and spectrum licenses. So I don't think that the history here has somehow muddled the distinction between those two things, and there remain certain types of licenses that are site-specific and authorized construction, and this order has no application to that kind of license. Now, to Your Honor's point about the discussion about historic and environmental interests in the 1990 order and in the genesis of the commission's limited approval authority, I think what the commission was quite clearly doing there, and I think that this court recognized what it was doing in CCIA, was an analysis under the Communications Act public interest authority. Because after all, 319B says you should not have anything to do with construction permitting anymore unless you determine that it's in the public interest to do so. So the commission, in effect, was saying as a matter of public interest under the Communications Act, we take into account the benefits of historic preservation and environmental review. It is not the case that the commission was saying that the statutes applied on their own terms. And just to finish the point, the Communications Act, as a number of other goals as well, including the goal of efficiently deploying infrastructure, that the commission needs also to take into account. In 1990, the commission obviously made a determination that with regard to the wireless facilities that were in place then, that were being constructed then, to a far different type than the small facilities now, that it was beneficial that the benefits of environment and historic preservation review outweighed the costs of such review. But the commission took a look in this order at a very different record with regard to a very different set of facilities that support a new modern technology and saw a quite different balance of costs and benefits. And the record showed that the costs of a review were running into millions of dollars and were going to be increasing as small wireless facilities, which are numerous and are going to be deployed in more numbers, needed to be deployed. There hasn't previously been a time when the commission said, this activity involves only spectrum licensing, not construction licensing, and therefore no historic preservation or environmental review is required. This is the first time that that position has been taken. Is that correct? Well, I don't know over the run of commission determinations. I think that it is, I guess what I can say for sure, is the commission had engaged in pre-construction review under limited approval authority because of its, to facilitate that review in the past. What did it do before that? Before that? Right before the interim approval authority, what did the commission do? Well, I'm not quite sure, Your Honor. I'm assuming that if the geographic area service spectrum licensing unconnected with construction permitting was occurring, that there was no requirement. Under 319D, right? What's that? Under 319D. I think Your Honor's point is exactly right. We would have been in a world of 319D alone, and there really wouldn't have been any basis. So your point is all the commission, and I'm not saying I agree with this, but all the commission has done here is now removed small cell sites from the exception it created in the limited approval authority. Exactly. And put it back under the statute. Right. So we're back in the world. Go ahead. Well, we're back in the world before the limited, with regard to this limited class of small cells before the limited approval authority. And that's my question, and I think that's what maybe Judge Pillard is getting at the same question. Before the limited authority, did the commission do any environmental or historic review in connection with, even though it didn't approve construction, did it look at historic or environmental issues in connection with the granting of licenses? Nothing. I think the commission did do some review of the large towers at the time, but when, I guess the real question is when Congress removed the construction permitting requirement. Right. In 1982. There's nothing in the record to show that the commission did any review until the limited approval authority in the 1990 order. But you've said it's nothing that shows that you actually had licensed spectrum that was deployed through construction that was unreviewed. I thought uniformly that, in fact, the commission worked, whether through the 1990 order or through the limited approval authority, that it worked to find a time and place to do. I thought Judge Tatel's question dealt with this sort of period between 1982 and 1990. I think Your Honor is correct. After 1990, there was a limited approval authority, but in a sense what the commission was doing was leveraging its Communications Act public interest determination to require historical. Except it doesn't refer once. I read your brief and I thought, oh, right, that's under the public interest authority, but those do not speak to the public interest authority. They're not based on or citing the public interest authority. Are they? Well, I think the limited approval, I think the best case is CTIA because I think that's the way CTIA also viewed the commission's exercise of authority. But one has to look at what the commission's authority, and it was challenged in CTIA what the authority was. But because it's a limited approval authority, I read that phrase as meaning if the commission retained an approval arising out of 319B. Well, did the commission mention its public interest authority in the limited approval? In adopting? Yeah. I think that in context, yes, that the commission is. Does that mean it only assumes it didn't say it? Well, I guess what it also didn't say is that it didn't analyze the National Historic Preservation Act terms or the National Environment Policy Act terms either. It didn't make a determination. CTIA makes clear, and the commission made clear in CTIA, that it never addressed the question before. And CTIA didn't address the question of whether the spectrum licensing itself was. But your point is that our decisions, the CTIA, that treats what the commission did in the limited authority rule as exercising its public interest authority. It has to be because. Right. Because there's no. CTIA isn't a NHPA or NEPA. So let me just ask you two questions about what's going to happen in the future. Take the example that Ms. Landers gave about a tower being built on an Indian burial site. Under this, if this is sustained, what remedies do the tribes have? I think they have the same. Well, assuming it's a small, within the class, the limited class of small cells. Yeah, that's right. They have the same remedies that they have. State and local zoning authorities and historic preservation interests will still remain. This is assuming that there is, for whatever reason, an actual piece of new construction on an Indian site. And by the way, the order by its terms does not apply to any construction on tribal land itself. What we were talking about are sites around the country off of tribal lands. So it's going to be state and local remedies, right? Excuse me? State and local remedies. Yes. Okay. And so what's the theory behind, I understand the argument about the small cell devices that can be put on existing infrastructure. But 20% of them are going to require new construction, right? Am I right about that? The evidence showed that there could be, one comment showed that 20% of the deployment was not co-located. Yeah. Isn't that what I just said? 20% are going to require new construction. So what's the possible argument for excluding those? Well, the record did show- Aren't they just like existing? They're no different than the antennas covered by the limited authority. Well, I guess, first of all, the reason we exclude them is that NHPA and NEPA don't apply. So if the statutes don't apply, if they're not major federal actions- No, no, no. I was asking you a different question. I was asking you, as I understand the issue we have, the question is, did the commission act arbitrarily and capriciously in exempting small cell devices from the limited construction authority, right? Yes. That's the question before us. Well, I'm asking you, how does that fit with the 20% that required? How do I know that that part of it wasn't arbitrary and capricious? So two other- Those towers look just like all other towers. So two other facts in the record. Yeah. One was, at paragraph 92, the commission, in citing footnote 201, the commission cited not only was this 80% co-located figure, but that most of these deployments, it appears, are on previously disturbed ground. I think Judge Pillard had mentioned the idea that if you put a tower, even a new construction, on a right-of-way where there are other utility poles already there, that the possibility and the likelihood of any environmental or historic preservation impact is also lessened. And then we do have the record evidence in paragraph 79 about the carrier's experience in all of these deployments of small cell, which include the new construction, that they had review after review after review, and their experience was only a minuscule proportion of those reviews led to any kind of historic or environmental impact. So I think that includes your example of the new construction. And that's evidence that, in fact, that as a practical matter, that new construction doesn't also give rise to historic or environmental impacts. Well, Mr. Loeb, I'm curious about that. So it's a very small proportion. But it may well be a very small proportion that's very important to the people involved. And if you prevail on the claims about limiting the ability of the tribes to charge and limiting the time period for those objections, it's not clear to me why there would be major remaining costs for any of these deployments. I'm puzzled by, given that there is some circumstances in which, I mean, the tribes argue that the companies are deterred from placing things where they would be interfering with historic sites, that there are, yes, there are a few times, but those are really important to them. So is there not a way to achieve, you know, attention to those few, but as the other changes that this rule might engross, take care of these sort of hold-up situations? I think the commission did examine the record as a whole and found that the likelihood of those kinds of examples was just minuscule and so small in relation to the costs that were occurring, the review, that in thousands of cases had no possible historic or environmental impact. But to Your Honor's point, I'm not saying that the commission couldn't have shifted the line one way or the other in its judgment. It drew the line here and I think reasonably explained the line. And what Your Honor is talking about is just simply that, yes, the commission had a range of options open to it, but the standard here is whether the commission had substantial evidence in the record for its determination. I just like your response to the arguments about, and I know that your initial, your first line response is forfeiture, but if there is a claim that the order itself was an action requiring review under environmental and historic preservation law, and on the environmental side, that the way to deal with this kind of wholesale, widespread, diffuse, individually small, impact type of activity is to do a categorical exclusion, why wasn't that done and isn't that legally required? Well, so I think actually, I think CTIA has a footnote too, where the same argument was made with regard to the historic preservation argument that the order itself required historic preservation review. The CTIA court rejected it on the basis of this court's previous determination in a case called Shervin-Calarama, where the court actually characterized that discussion as being a weird argument, I forget exactly, an odd argument, because in its, to take it to its logical extent, it would mean the commission would have to do an NHPA or a NEPA review for every decision in which it changes the overlying regulatory structure. And these are, again, private, the impact is not an NHPA and the claim to NHPA and NEPA impact is not the commission, the impact of the commission's promulgating an order or changing the rules, it's the private decisions that would take place or assumed to take place in response to that regulatory change. And those, again, private decisions are the ones that are not subject, that have an impact here and not subject to NHPA. I think the response is, no, it's the regime that's being put in place. Well, again, I think this is our general point, that you have to distinguish between what the federal government is actually doing and where the complaint is coming from. The complaint is regarding the deployment of the facilities. Those facilities are being deployed by private carriers under a regulatory umbrella, to be sure, but they are not the decisions, the FCC is not going out and putting up any small cells here. Thank you. Thank you. We'll hear from the intervener. Good morning, your honors. Joshua Turner on behalf of CTIA, the Wireless Association. The FCC's order recognizes an important reality about the evolution of wireless service and technology. As demand for wireless service has grown, some of the infrastructure used to provide that service has gotten smaller. And the concomitant result of that is that the impact of that infrastructure on state historical and environmental resources has also shrunk. The FCC logically recognized that small cell facilities should not be treated or regulated the same way as a 200-foot or 1,000-foot radio tower. Of course, joined with the commission's discussion of the merits, I'd like to touch on three points, if I could. I mean, this could authorize, it does authorize a 2,000-foot or 1,000-foot radio tower if there are other adjacent radio towers up top, right? You can go as tall as or 10% above, whatever's in the area. No, your honor, because you would still be subject to registration with the FAA in that circumstance, and you would then have a separate hook by which you would still be subject to federal jurisdiction. So even if it's in Manhattan, where it's already things up that high. Yes, that would be out. So I'd like to touch on three points, and a lot of this has already been touched on a little bit. First, the lack of impact. With respect to the tribes, the record here shows that there have been thousands upon thousands of tribal notifications issued by the carrier since 2004, with few, if any, negative findings. Sprint, for example, despite having an indicated interest in and charging fees for most of the thousands of sites that Sprint built, the tribes requested zero substantive consultations and noted zero actual or potential adverse impacts. Crown Castle had a similar record, never received a negative report or recommendation for a small cell deployment, and Verizon reported only 0.3% of all requests received a finding of adverse effects. So why is this such a burden? I'm sorry? Why is this such a burden, then? Well, because we have to go through the process, and what I'm talking about here are the adverse effects, right? We have to go through the process for these sites and spend the money on these sites, even if there is no suggestion of interest by the tribes. And so that's the second point that I wanted to get to, Your Honor, actually, is the cost of regulation. And I think the costs of regulation were very much understated by my opponent. The cost of complying with these superfluous requirements was large and growing. One CTIA member estimated the approval process added four to six months to the time to get a site on air. In addition to that. Has that not been dealt with by the shorter timeline and by the non-payment services? I think the shorter timeline certainly helps, and I think that in isolation would be a helpful step on the part of the commission. But I think we also are looking at the cost and timeline of regulatory compliance, and those for small cells would still be a burden in terms of getting these things on air. Why is that? Just give us a little more granularity about what the providers have to do in the absence of any tribal involvement. I don't think it's in the absence of any tribal involvement. The way in which the sort of tribal involvement is excluded is through the revisions to the rules that exclude small cells entirely, which I understand would be Your Honor's question. So that's the way you take them off the table completely. But short of that, assuming that the small cells are still subject to the National Historic Preservation Act, but that the process-based reforms are in place, how do you envision the burdens to be present and non-mitigated? Well, I think the burdens would still be there, because we would still have to go through the process. And even though that process would be shortened, and even though the fees would be limited, it would still be a process that we would need to undertake. And as I think Counsel for the FCC stated, it's certainly possible that the FCC could have drawn this line into a different place. The question for this Court is, did the FCC draw a line that's supported by evidence in the record? I think the evidence in the record shows that there are two components to this delay, to these concerns. One is the cost, fees that are being charged, right, which Your Honor points out would be limited. But the other is the exercise of the process and having to go through the motions of the process entirely. Right, which is sort of what I'm trying to understand. So let's say there's, you know, some little settlement out in the middle of nowhere, and a provider is going to set up small cells along a highway to get there, or through an old farm road, you know, across lots and lots of land to get there. And they, you know, they don't think there's going to be any impact on any of these properties. And so what next? Where's the burden? What happens? Well, and Your Honor actually makes an important point, and this is something that I wanted to address as well, just from a technological standpoint. The kinds of circumstances that you're talking about are unlikely candidates for small cells, right? So small cells are usually used, not always, but usually used in dense urban environments where you're providing additional capacity by making the size of the cells smaller. In a circumstance like the one that you're talking about, quite likely the provider would build a familiar macro tower and would provide service using that because it's more efficient to do that, provide service over a greater area, and you don't have to worry about a high-capacity network issue where you're trying to make sure that you've got enough cells around to handle all of it. And that would be subject to all the environmental... Right. That would be subject to... Exactly. That would not be excluded from any system. But let's imagine it's in a town. I mean, you were in the middle of an answer when you had digressed on that. Sure. Imagine it's a smaller town that hasn't had it, and they're densifying, and there's some places that the tribe cares about. What... I just want to know what the burdensome process is. Well, under the new rules, if we were talking just about small cells, there wouldn't be one. But I'm imagining that small cells are still covered... Still covered, but there still are... But there are the mitigating procedural benefits. And I think, to Your Honor's point, it's sort of hard to know what that would look like. I think it would be certainly a welcome relief. Well, what do you do? You have, you know, 100 small cells you're going to put in, you know, small-town USA. Yes. And is there not a way to look at the 100 all together and just say, you know, look around, no problem, done? Well, and Your Honor, one important point that I want to emphasize, I realize this is not exactly what you're asking, but I think it's critical to remember that the vast majority of the review that's done with respect to these siting decisions is done at the state and local level. And Congress actually spoke to that in Section 332, preserving local zoning authority, and saying the states and the locals get to make decisions in person about where these facilities are. And what about the tribes? That's what the tribes are saying. You know, they're states and locals, and they have a sovereignty, too, and under the NHPA that extends beyond reservation-wise. I'm just trying to understand what you actually do there and why it is so burdensome. You give me a realistic situation where there's a huge smattering of these things that are going to go in. Is there not a kind of wholesale way to just kind of check that box? I mean, I guess I understand the NHPA thing better, where you actually can check a box. And I think under the new rules, even as limited by the FCC's rules with respect to fees and with respect to timing, we would still face that burden of having to go through the process of notifying, right? The process of notifying, you put it up on the... On TCNF. TCNF. Yes. And there would be an expression of interest by tribes, which we would have to... And I apologize if I'm not fully understanding Your Honor's hypothetical. No, I see what you're asking. Right. So we would put it up on TCNF. There would presumably be some sort of expression of interest. We would then have to work that through, and it would take some period of time in order to get that done. And just because we don't have to pay the fees up front doesn't mean the fees wouldn't necessarily be charged. So there are a series of protections that are provided in this order, limitations on what the tribes can and can't do, and I'm not 100% sure which, Your Honor, are imagining in this hypothetical would be in place and which ones wouldn't. So I'm struggling with one. Well, they don't have the ability to sort of hold it up, which is the thing that I thought the order was concerned about. And so you say, well, we don't see anything. They come in and they either say we see something or we don't. If they say we see something, you say, you know, we're going to have, you know, study it, and they're saying, well, we refuse to study it, and you say, okay, we're going ahead. Yeah, and I think Your Honor's point is well taken, which is that with the limitations on the timelines for tribal review, which my opponents are challenging, of course. I understand that. I'm trying to separate out the two issues and understand their separate impacts. My understanding is that there would still be a non-zero impact on our ability to deploy these facilities, even with the limitations on tribal review, because we would be held up in terms of building these facilities out while we went through that process. While that would be a welcome amount less than our current process or than the process prior to this order, it would still be a process that is fundamentally unnecessary because of the commission's determination that these aren't covered by. Okay. Thank you. Thank you. I think all three were out of time. You can have three minutes. You can each take one, or one of you can argue for three. Your Honor, could I respectfully ask for two and then pass one minute to Ms. Landry? Yes, as long as it's three. Don't use up your time arguing about the time. You've got three minutes, and the clock has started. Excuse me for each of us. You're going to each take a minute? Yes, thank you. Go ahead. Thank you, Your Honor. First, it's important to understand that the NHPA creates a separate and independent responsibility on the FTC. The issuance of the license triggers the NHPA. Under Section 319, pre-construction review was optional, but this was how they complied with the NHPA. So if they want to get rid of the pre-construction review, as they're doing, they're out of compliance with NHPA until they come up with some other mechanism completely distinct from 319. It basically is this. The FTC has a choice. They can renew their dialogue with the ACHP, or they can ask Congress to change it, but they have this obligation under the statute. Very quickly, the fees issue, Your Honor. We've seen these numbers. The commission has acknowledged that most tribes have not engaged in charging exorbitant fees, but rather fees consistent with their costs. This is the second report in order at footnote 304, and I would note that it's absurd. The amount of money that's being paid for these licenses to say that the cost of compliance with a federal statute is exorbitant is outrageous. And so I think that takes up my time, but there was just one last thing. Oh, and that is the examples of the sites that have been saved. Just one of the 573 tribes alone, the Seminole, they provided six examples of sites that have been saved. This is Joint Appendix 370. This is our national cultural heritage. This is not something that can be dismissed outright as it has been done by the FTC. Thank you. Thank you, Your Honor. Thank you. Two quick points. This is not a case about whether they were arbitrary capricious under the public interest determination. It is a case of whether they have the authority, as counsel from the FCC said, to decide whether NEPA and the NHPA are applicable here. That is not authority Congress gave them. This case also involves NEPA and the NHPA, and it is CEQ and the Advisory Council that have the authority to determine it. Their interpretation violates the plain language of those two statutes and the applicable regulations. On the issue of the rule, so there's a key difference between, for the most part, undertaking and major federal actions are the same, but there's a key difference. Rules are included in CEQ's definition of major federal actions. They are not in the definition of undertaking. And just to address the question of waiver, of that argument, whether the order violated NEPA, the order itself, first of all, the FCC did not raise an issue of waiver. It was just the industry intervenors. The standard, as we cited in our brief, is whether the FCC had a fair opportunity to address the issue. We cited several places in the record that gave them that opportunity. And two dissents, two of the five commissioners dissented, flagging failure to comply with NEPA. Okay. Thank you. Thank you. Natalie Landreth again, Your Honors. I also just want to make a couple of quick points. One was to the question of what remedy do the tribes have now, and the answer is none. Because right now, without TCNS, they have no idea what's going on. That's point number one. Point number two, they make a, dependents and the intervenors make a big deal talking about how they expect the impacts to be, quote, minimal in their view, and that all these are off tribal lands, or a large number of them, and on tribal lands are protected. I think we all know why that's irrelevant, and that's because of the forced removal and dispossession of most Native American people. Their sites are off tribal lands, with very few exceptions. Last thing I would add is that the court do the math. Do the math. If there are 100,000 sites coming in the next few years, as dependents can see it, excuse me, three-tenths of 1% is 300 sites lost to all of us forever. They may think that's infinitesimal. To us, it means the world. Thank you, Your Honors. Thank you all. Peace. Thank you.
judges: Tatel, Pillard, Edwards